WILLIAM K. BIXBY, Trustee Under Will of WILLIAM McMILLAN, v. ST. LOUIS UNION TRUST COMPANY ET AL.; ST. LOUIS UNION TRUST COMPANY, Executor of Will of WILLIAM NORTHRUP McMILLAN, Appellant.

WILLIAM K. BIXBY, Trustee Under Will of WILLIAM McMILLAN, v. ST. LOUIS UNION TRUST COMPANY ET AL.; LUCIE McMILLAN, Appellant.—22 S. W. (2d) 813.

Division Two, October 4, 1929.

*Sears Lehmann, Frank Y. Gladney, Clinton E. Bell* and *F. W. Lehmann* for appellants.

*Taylor, Chasnoff & Willson* for respondents, St. Louis Union Trust Company and Wm. K. Bixby, Trustees of Estate of Eliza McMillan.

HENWOOD, C.—This suit was filed by William K. Bixby, as a trustee under the will of William McMillan, to determine whether certain income of the William McMillan trust estate shall be paid to the estate of the testator's widow, Eliza McMillan, or the estate of his son, Northrup McMillan. The issues are issues of law only, involving the construction of William McMillan's will and the validity of a contract made by his widow and son. The trial court held that the contract is a valid one, and found and adjudged that, by virtue of the contract, the estate of Eliza McMillan is entitled to an escrow fund of $265,332.94 and accumulations thereof and the additional sum of $94,351.72. Separate appeals were taken by the St. Louis Union Trust Company, as executor of the will of Northrup McMillan, and Lucie McMillan, widow of Northrup McMillan, and, as above indicated, said appeals have been consolidated in this court.

The facts with which we are concerned, in the main, appear in connected form in the decree of the trial court. Omitting matters now immaterial, the decree reads as follows:

"The court having duly considered the issues and the evidence adduced, and being fully advised in the premises, doth accordingly find:

"II.

"That William McMillan died testate a resident and citizen of the State of Missouri on or about the 19th day of November, 1901; that his will was duly probated in the Probate Court of the City of St. Louis, Missouri, on or about the 23rd day of November, 1901; that by said will said testator, after providing for the payment of his debts, devised and bequeathed the residue of his said estate unto his wife, Eliza McMillan, their son William Northrup McMillan (who is and was sometimes known, and is sometimes hereinafter referred to, as Northrup McMillan) and the plaintiff William K. Bixby, and to the survivor or survivors of them, as trustees, for the equal benefit of said Eliza McMillan and said Northrup McMillan during their joint lives, and to pay over the entire net income from the trust created by said will (which trust is known as the 'William McMillan Trust Estate,' and is sometimes so referred to in this decree); that by said William McMillan will it was provided that in the event of the death of either said Eliza McMillan or said Northrup McMillan the entire income from said trust estate should be paid to the survivor of said Eliza McMillan and said Northrup McMillan, and that said William McMillan will also contained the following provision material to this suit:

"'The net income to be paid over in equal parts, share and share alike to my said wife, Eliza McMillan, and said son, William Northrup McMillan, in equal quarterly installments, free from interference or control of creditors, and I hereby declare it to be my intention

that neither of said beneficiaries shall have the right to alienate, encumber or otherwise dispose of their respective interests in the trust estate hereby created, or any part thereof, or in any way anticipate or charge the income to be derived therefrom.'

"That said Eliza McMillan, said Northrup McMillan and the plaintiff were duly appointed executors under said will and with plaintiff became the trustees under said will, and that plaintiff is now the sole surviving trustee of said William McMillan trust estate.

"III.

"That on or about the 6th day of October, 1913, said Eliza McMillan and said Northrup McMillan entered into an agreement in writing, sometimes hereinafter referred to as the 1913 Agreement, which agreement is in words and figures as follows:

" 'This Agreement, made this sixth day of October, 1913, by and between Eliza McMillan, of the city of St. Louis, and State of Missouri, party of the first part, and William Northrup McMillan, of the same place but now residing abroad, party of the second part, witnesseth: that,

" 'Whereas, by his will dated the 23rd day of November, 1901, duly admitted to probate by the Probate Court of the said City of St. Louis, the late William McMillan devised and bequeathed all his residuary estate to the said Eliza McMillan, the said William Northrup McMillan and William K. Bixby, the latter also being of the city of St. Louis, as joint trustees, for the equal benefit of the parties of the first and second parts during their joint lives and for the sole benefit of the survivor of them during his or her life, with the proviso that if the said party of the second part shall leave any lineal descendant or descendants, the latter shall receive his share of said net income during the lifetime of the party of the first part; and,

" 'Whereas, the party of the first part wishes to secure from the party of the second part, in the event he shall survive her, the use of one-quarter of the said net income for certain purposes to be set forth and declared in her last will; and,

" 'Whereas, the party of the second part wishes to secure from the party of the first part, in the event she shall survive him, the use and enjoyment by his wife, in the event the latter also shall survive him but no lineal descendant of his shall be living at the time of his death, of one-quarter of the said net income;

" 'Now, therefore, in consideration of the premises and of the mutual covenants hereinafter set forth and of other valuable considerations from each to the other moving, the parties of the first and second parts hereby agree each with the other, as follows:

" 'The party of the first part agrees that if she shall survive the party of the second part and at the time of his death his wife, Lucie McMillan, shall be living but no lineal descendant of his shall survive him, she, the party of the first part, will pay and account for to the said Lucie McMillan one-quarter of all the net income and revenue which she may, at any time and from time to time, receive during their joint lives from the said estate of William McMillan, deceased, promptly after the receipt of the same.

" 'And the party of the second part hereby agrees that if he shall survive the party of the first part, he will, during his lifetime, promptly pay over and account for to the trustees of the residuary estate under her last will one-quarter of all the net income and revenue which he may, at any time and from time to time, during his life, receive from the said estate of William McMillan, deceased; or if the party of the first part shall not leave her residuary estate in trust, that he, the party of the second part, will promptly pay the said one-quarter of the said net income to the St. Louis Union Trust Company, as aforesaid, for distribution by it, from time to time, in the manner and among the persons to whom and in the proportions in which her residuary estate may be left by her said will.

" 'In Witness Whereof, the parties of the first and second parts have hereunto set their hands and seals the day and year first aforesaid.'

"IV. & V.

"That said Eliza McMillan died on or about the 16th day of January, 1915, a citizen of the city of St. Louis, Missouri; that she left a last will and testament dated May 15, 1914, which was duly probated in the Probate Court of the City of St. Louis, Missouri, on or about the 27th day of January, 1915; that thereby and pursuant thereto defendants St. Louis Union Trust Company and William K. Bixby were duly appointed, qualified and are acting as executors under said will; that by said will certain trusts were created, and that said defendants St. Louis Union Trust Company and William K. Bixby are the duly qualified and acting trustees of the trust created by the fifth clause of the will of said Eliza McMillan, by the terms of which clause she gave, devised and bequeathed to said trustees all the rest and residue·of her estate (after making certain specific devises and bequests in other clauses), and which will is hereinafter referred to as the Eliza McMillan will; that said will, among other provisions, contained the following paragraphs material to this suit:

" 'Second. (a) . . .

" 'My son and I have, by written instrument, dated October 6, 1913, agreed, among other things, that. if at my death he shall be

living he will thereafter, during his life, pay over to the trustees of my residuary estate one-quarter of the net income received from the estate of his father. I therefore am able to leave him one hundred thousand dollars ($100,000) and make other bequests which I wish to make. He to take in satisfaction of this legacy any bonds belonging to my estate having a par value of one hundred thousand dollars.

" 'I make no other provision for my said son in and by this will, for the reason that he has already been amply provided for in and by his father's will.'

"And said fifth clause of said Eliza McMillan will, after making provision for certain annuities provided for, provides that said trust should cease after the expiration of a period of twenty years from the date of her death and after the death of certain named persons, and that, upon the termination of the trust, the trust fund, together with the then unexpended or undivided income therefrom, should be distributed equally, share and share alike, among and paid to . . . (various legatees named in said clause of her will).

## "VI.

"That after the death of Eliza McMillan said Northrup McMillan received from the executors of Eliza McMillan will the sum of one hundred thousand dollars ($100,000) bequeathed to him pursuant to the terms thereof hereinbefore set forth, and that immediately after his mother's death said Northrup McMillan began to receive the entire net income of the William McMillan trust estate, including the share of the income which had theretofore been payable to his mother, the said Eliza McMillan, under the terms of said William McMillan will, and that until August 31, 1917, the said Northrup McMillan paid or caused to be paid over to the said Eliza McMillan estate one-fourth of the amounts which he from time to time received as income from his father's estate as provided in the said 1913 agreement.

## "VII.

"That in September, 1917, a document, which will hereafter be referred to as the 'Purported Equitable Assignment of 1917,' was executed by Northrup McMillan at Nairobi, British East Africa, under date of September 17, 1917, said instrument being in words and figures as follows:

" 'Whereas, by agreement made October 6th, 1913, between Eliza McMillan, of the city of St. Louis, Missouri, and the undersigned, William Northrup McMillan, it was agreed that in the event the undersigned, William Northrup McMillan, survived the said Eliza McMillan, he would during his lifetime pay over and account to the

trustees of the residuary estate under the last will and testament of the said Eliza McMillan, one-quarter of all the net income and revenue which he might at any time during his lifetime receive from the said estate of William McMillan, deceased; and,

" 'Whereas, said agreement was intended to be an equitable assignment of one-quarter of the net income and revenue which would be payable to the undersigned during his life from the estate of William McMillan, deceased, from and after the death of Eliza McMillan, which latter event occurred on January 16th, 1915;

" 'Now, Therefore, for the purpose of giving full force and effect to the intent of the parties in entering into said above-mentioned agreement October 6th, 1913, the undersigned hereby assigns to the St. Louis Union Trust Company and William K. Bixby, trustees of the residuary estate under the last will and testament of Eliza McMillan, deceased, one-quarter of the net income and revenue which may become due and payable from and after January 1st, 1917, and the trustees under the will of William McMillan, deceased, are hereby requested and directed to make distribution of said one-quarter of the net income and revenue which would otherwise be payable to me directly to the above-named trustees under the will of Eliza McMillan, deceased, in accordance with this request—this instrument to become effective as of January 1st, 1917.

" 'In Witness Whereof, I have hereunto subscribed my name on this 17th day of September, 1917.'

"That said purported equitable assignment of 1917 was by Northrup McMillan lodged with the trustees of the William McMillan estate. That nevertheless until May 31, 1921, payments representing what purported to be one-fourth of the total net income of the William McMillan estate payable to Northrup McMillan continued to be paid over to the estate of Eliza McMillan by or for the account of said Northrup McMillan.

"That thereafter said payments were, at the direction of Northrup McMillan, discontinued, said Northrup McMillan claiming that said 1913 agreement and purported equitable assignment of 1917 were void.

## "VIII.

"That on or about February 7, 1923, an agreement was entered into between Northrup McMillan, the St. Louis Union Trust Company, as depositary, and the trustees of the Eliza McMillan estate, which is hereafter referred to as the 'Escrow Agreement,' which agreement recited that Northrup McMillan 'is now the sole beneficiary and life tenant under the last will and testament of his deceased father, William McMillan, and as such life tenant is receiving the entire net income from the testamentary trustees under the

1022

last will and testament of William McMillan, deceased.' Said escrow agreement also referred to the 1913 agreement and recited that a dispute had arisen 'with respect to the validity' thereof, and that certain payments which should have been paid by Northrup McMillan to the Eliza McMillan trustees 'if the said contract is valid' had been withheld and had accumulated in the possession of the testamentary trustees under the last will and testament of William McMillan, deceased, and that certain other payments would continue to accrue under the terms of said 1913 agreement payable by said Northrup McMillan to the Eliza McMillan estate if the said 1913 agreement is valid, and that Northrup McMillan had caused or would cause a proper proceeding to be instituted to determine the validity of the 1913 agreement; that said escrow agreement further provided that the amount then due, if the said 1913 agreement was valid, and all other payments which might accumulate pending litigation, should be paid into an escrow fund to be retained by said depositary until it should be determined by a court of competent jurisdiction as to whether or not the 1913 agreement was valid or void, and if it should be determined that said agreement was valid, then the escrow fund should be paid over to the trustees under the fifth clause of the Eliza McMillan will.

"That pursuant to said escrow agreement there has been deposited with St. Louis Union Trust Company, as depositary, the sum of $265,332.94 as principal, and said sum, together with certain accumulations, consisting of $3,069,55, which sum of $3,069.55 was paid over to said depositary as interest or income on a portion of said fund prior to such deposit, and of the income and earnings of said entire fund while in its possession, is now in the hands of said depositary.

"IX.

"That at the time of the filing of this suit said Northrup McMillan had not instituted any action to determine whether or not said 1913 agreement was void, but in this suit said Northrup McMillan was made a party defendant, so that said issue could be determined herein; that after the institution of this suit and on or about March 22, 1925, said William Northrup McMillan died, his death was suggested and St. Louis Union Trust Company, as executor of the will of William Northrup McMillan, was made a party defendant herein, as were also St. Louis Union Trust Company, as trustee under said will, and his widow, defendant Lucie McMillan, who, prior to the date of this decree, became the sole beneficiary under his said will.

"X.

"That the total net income of the William McMillan trust estate, which had accrued from the date of the death of Eliza McMillan to

the death of Northrup McMillan, was $3,089,951.72, all of which was paid over by the trustees of said William McMillan estate to or for the account of Northrup McMillan during his lifetime except $150,498.38, which last amount represents income accrued during his lifetime and which was not paid over to said Northrup McMillan during his lifetime, so that during the lifetime of Northrup McMillan and after the death of Eliza McMillan there was paid to him or for his account, by the William McMillan estate, as income of said William McMillan estate, the sum of $2,939,453.34, one-fourth of which amounts to $734,863.33.

"That there has heretofore been paid over to the estate of Eliza McMillan by or for the account of said Northrup McMillan, and on account of said 1913 agreement, the sum of only $399,635.53.

"That there has been paid into the said escrow fund for the account of the trustees of the Eliza McMillan estate, if they should be found to be entitled thereto, the sum of $265,332.94, which sum, together with the accumulations thereto by way of income, is now in the hands of St. Louis Union Trust Company as depositary under said escrow agreement.

"That the aggregate of the payments made directly to the Eliza McMillan estate and the principal sums paid into said escrow fund is $664,968.47, and that said sum falls $69,894.86 short of equalling one-fourth of the amount paid to or for the account of Northrup McMillan during his lifetime and after the death of Eliza McMillan as income from his father's estate.

"That the items making up the $69,894.86 represent payments which should, under the terms of the 1913 agreement, have been made by Northrup McMillan to the estate of Eliza McMillan on account of income which he had theretofore received from his father's estate on the dates set after said respective items, and which are as follows:

| | |
|---|---|
| $29,197.47 | September 2, 1920 |
| 25,872.92 | February 28, 1920 |
| 6,393.86 | May 28, 1920 |
| 8,430.63 | February 28, 1925 |

"Now, therefore, it is ordered, adjudged and decreed by the court:

"First: That the said 1913 agreement is and has been since the date thereof a valid agreement, binding upon the parties thereto and their legal representatives. That by reason of said 1913 agreement said Northrup McMillan and his legal representatives became bound to pay over to defendants William K. Bixby and St. Louis Union Trust Company, as trustees under the will of Eliza McMillan, deceased, a sum equal to one-fourth of whatever income he might

receive during his lifetime from the William McMillan trust estate from and after January 16, 1915, but that there is no obligation on the legal representative of Northrup McMillan to pay over and account to the trustees under the will of Eliza McMillan for one-fourth of the income from the William McMillan trust estate accrued during the lifetime of Northrup McMillan, but which was not paid over to him or for his account during his lifetime.

"Second: That said 1913 agreement does not constitute an equitable assignment or any assignment of funds in the hands of the trustees of William McMillan estate and is not violative of any of the provisions of said will of William McMillan, deceased, and that said 1913 agreement never vested in the Eliza McMillan estate or the trustees or executors thereof any claim or right against the trustees under the will of William McMillan as such or against the William McMillan trust estate or the assets thereof.

"Third: That said purported assignment of 1917 is void and of no effect as a conveyance of any of the corpus or the income of the William McMillan trust estate; was not and is not binding in any way upon the trustees of the William McMillan estate as such and did not operate to vest in the Eliza McMillan estate or the executors or trustees thereof any equitable ownership of or right to the assets or income of the William McMillan trust estate.

"Fourth: That under the terms of said 1913 agreement there became due and payable to William K. Bixby and St. Louis Union Trust Company, as trustees under the will of Eliza McMillan, deceased, from Northrup McMillan and his legal representatives, an aggregate sum of $734,863.33 principal, of which amount $399,635.53 principal has been paid and on account of which said Northrup McMillan and his legal representatives are entitled to credit, leaving a balance of $335,227.80 principal and in addition thereto certain accumulations and interest, as hereinafter set forth, still due from defendant St. Louis Union Trust Company, executor under the will of Northrup McMillan, deceased, to defendants William K. Bixby and St. Louis Union Trust Company as trustees under the will of Eliza McMillan, deceased.

"Fifth: That the assets in said escrow fund in the hands of St. Louis Union Trust Company as depositary, together with all income and accumulations thereon, constitute a fund which ought to be delivered to defendants William K. Bixby and St. Louis Union Trust Company as trustees of the estate of Eliza McMillan, deceased, and upon the delivery of which defendant St. Louis Union Trust Company, as executor of the estate of Northrup McMillan, deceased, will be entitled to a credit for the principal amount thereof, to-wit, $265,332.94, and said defendant St. Louis Union Trust Company as

executor of the estate of Northrup McMillan, deceased, is therefore ordered to execute and deliver to William K. Bixby and St. Louis Union Trust Company, as trustees under the will of Eliza McMillan, such documents and conveyances as will entitle them to receive and to deliver to said St. Louis Union Trust Company as depositary under said escrow agreement, such instructions as will authorize and direct it to deliver said fund, together with the accumulations thereof, to defendants William K. Bixby and St. Louis Union Trust Company as trustees under the will of Eliza McMillan, and upon such delivery to discharge said St. Louis Union Trust Company as depositary from all liability to said St. Louis Union Trust Company as executor under the will of Northrup McMillan, deceased, on account of said escrow agreement and said escrow fund; and upon delivery of said escrow fund and its accumulations to said defendants William K. Bixby and St. Louis Union Trust Company as trustees under the will of Eliza McMillan, deceased, said estate of Northrup McMillan and the executor thereof shall be entitled to a credit of $265,332.94 against the total balance found due as above, and thereupon said St. Louis Union Trust Company as depositary shall stand discharged from any and all liability under said escrow agreement.

"That in determining the principal and accumulations of said escrow fund, as aforesaid, the sum of $3,069.55, designated as income accumulated prior to the deposit with said depositary shall be treated as part of the accumulation of said fund.

"Sixth: That defendants William K. Bixby and St. Louis Union Trust Company as trustees under the will of Eliza McMillan, deceased, in addition to the foregoing sums, have and recover of St. Louis Union Trust Company as executor under the will of Northrup McMillan the sum of $94,351.72 consisting of balance of principal due under said 1913 agreement in the sum of $69,894.86, together with interest thereon at the rate of six per cent per annum from the date when the items thereof as hereinbefore found became due to the date of this decree."

The following, taken from the statement in appellants' brief, is explanatory of the various transactions mentioned in the decree:

"Soon after the payments to the Eliza estate began, there arose the question as to the Federal income tax, and as to whether Northrup would be compelled to pay a tax on the entire income or on only three-fourths of it. Mr. Bixby and the accountants in his office considered that a direct assignment of the one-fourth part of the income would relieve Northrup of that portion of the tax. Accordingly, on September 17, 1917, Northrup executed an assignment to the Eliza estate of one-fourth of the income of the William estate.

"But the agents of the Internal Revenue Department held that both the agreement of October 6, 1913, and the subsequent assignment were void because in contravention of the will of William McMillan.

"The matter was then taken up with Mr. John F. Shepley, president of the trust company. On January 19, 1920, he wrote a letter, discussing the validity of the agreement of October 6, 1913. He agreed with the Internal Revenue Department.

"Northrup McMillan had been a resident of British East Africa for many years prior to his mother's death. He gained his information as to the affair here involved exclusively by mail, which required much time. On April 10, 1921, he wrote a letter to Mr. Bixby and the Trust Company as trustees of the Eliza McMillan estate, setting forth the history of the agreement of October 6, 1913, and of what had been his attitude with respect to the subject-matter. The letter is as follows:

" 'On October 16th (6th?), 1913, an agreement was drawn up between my mother and myself, under the terms of which, in case of my death, my mother agreed to give a quarter of the net income that she received from my father's estate to my wife, and, in case of her death, I agreed to give a quarter of the net income that I received from my father's estate to her estate. During my mother's last illness in Pasadena, this contract was revoked and canceled, the cancellation being signed by my mother and myself, and this cancellation, signed by the two parties, was sent to W. K. Bixby at St. Louis, and was returned by him to me with a letter stating that the terms of my mother's will could not be carried out if no part of the income from my father's estate was received by the trustees of her estate, as her will was based upon her estate receiving such funds. By the time this letter reached me, my mother was unconscious, but I immediately notified Mr. Bixby that I desired to have the terms of my mother's will carried out and directed him to pay to the trustees of my mother's estate one-quarter of the net amount received by me from my father's estate, and such payments have been made up to the present time, resulting in an accumulation of funds which now enable the trustees of her estate to carry out the terms of her will without any additional payments being made by me.

" 'I also notified Mr. Bixby at the time that I gave him directions as stated above, to draw up a new agreement, which I would sign, making an assignment to my mother's estate of this one-quarter interest. The new agreement was made in the form of an assignment, dated September 17th, 1917, and forwarded to William K. Bixby and St. Louis Union Trust Company, Trustees, at St. Louis. Since that time the U. S. Government ruled that such an assignment was void, and required me to pay income tax on the entire amount

received by me from my father's estate. I have, however, since that time, voluntarily paid to the trustees of my mother's estate one-quarter of the net income received by me, until, as stated above, at the present time her estate has reached proportions that enable her trustees to carry out all the provisions of her will without further assistance from me, and I therefore notify you that it is not my purpose to continue making further payments, as it seems to me that there is no reason, in law or in equity, for my doing so. My mother died without regaining consciousness, and I regard the payments that I have made since that time as being entirely voluntary and for the purpose of carrying out the terms of her will. I know that I have done more than she expected to have me do, and if the income of my mother's estate was not sufficient to carry out the terms of her will, I should gladly continue to make the necessary payments, regardless of my legal rights.'

"The attitude of the Government, of Mr. Shepley, and of Northrup McMillan, that the agreement of October 6, 1913, was invalid, and the refusal of Northrup to make further payments under it, led to the making of the escrow agreement of February 7, 1923."

Counsel for appellants contend, first, that the will of William McMillan creates a valid spendthrift trust; and second, that the 1913 agreement is void because it violates the restraints imposed by the testator against alienation and anticipation of the income of the trust estate. Counsel for the legal representatives of Eliza McMilllan (respondents here), though conceding the invalidity of the 1917 assignment, insist that the 1913 agreement did not affect the income of the trust estate until after it was received by Northrup McMillan and is therefore a binding obligation and enforceable against his estate. It is agreed that the testator did not intend to control the disposition of said income after it was paid to the beneficiaries, and that such a restraint, if intended, is against public policy and repugnant to well-settled principles of law.

I. The pertinent clauses of William McMillan's will are as follows:

"Second: All the rest and residue of my estate, whether real, personal or mixed property, of which I shall die seized and possessed, wherever situated, I hereby devise and bequeath unto my wife Eliza McMillan, my son William Northrup McMillan, and William K. Bixby, and to the survivor or survivors of them and their successors, as trustees, to have and to hold the same in trust for the following uses and purposes, to-wit: to have and to hold, manage and control the same for the equal benefit of my said wife Eliza McMillan, and my said son Wil-

liam Northrup McMillan, during their lives, and to pay over the net income therefrom to my said wife and to my said son in equal shares; that is, share and share alike during the lifetime of my said wife and my said son.

"In the event of the death of either of the parties named, the entire income to be paid to the survivor during his or her life; . . .

"Third: I hereby fully authorize and empower my said trustees, or the survivor or survivors of them, or their successors, during the continuance of this trust, as hereinabove provided, to receive, hold and manage my said residuary estate, with full power either to hold the same or to convey, assign, transfer, dispose of, mortgage or lease the whole or any part thereof, upon such terms and conditions, as in their judgment shall seem to be for the best interests of my said estate, with authority to invest and reinvest the proceeds of any sales made thereof, or any funds realized from sales on investments which I may have at the date of my decease, in such securities as may in their judgment seem best and most advantageous to my estate, preferring such investments to be made by said trustees in safe securities at a moderate rate of interest, barring doubtful securities bearing a high rate of interest. The net income to be paid over in equal parts, share and share alike, to my said wife Eliza McMillan, and my said son William Northrup McMillan, in equal quarterly instalments, free from interference or control of creditors, and I hereby declare it to be my intention that neither of said beneficiaries shall have the right to *alienate, encumber or otherwise dispose of* their respective interests in the trust estate hereby created, or any part thereof, or *in any way to anticipate or charge* the income to be derived therefrom." (Our italics.)

It is apparent at once that, by these provisions of his will, the testator created an active trust, known as a spendthrift trust, with the legal title to the trust property and the exclusive power to control, manage and dispose of the same vested in the trustees, and with equitable life estates in his widow and son in the income derived from the trust property, said beneficiaries being denied, in express terms, the right to *alienate, encumber or otherwise dispose of* their interests in the trust estate, or *in any way to anticipate or charge* the income to be derived therefrom. Regardless of the rule in other jurisdictions, the trust thus created is a valid spendthrift trust under the well-established rule in this State and one that the courts of this State will enforce. [Lampert v. Haydel, 96 Mo. 439, 9 S. W. 780; Partridge v. Cavender, 96 Mo. 452, 9 S. W. 785; Jarboe v. Hey, 122 Mo. 341, 26 S. W. 968; Kessner v. Phillips, 189 Mo. 515, 88 S. W. 66; Graham v. More (Mo. Sup.), 189 S. W. 1186; Maxwell v. Growney, 279 Mo. 113, 213 S. W. 427; Matthews v. Van Cleve,

282 Mo. 19, 221 S. W. 34; Lane v. Garrison, 293 Mo. 530, 239 S. W. 813.] For further discussion of the rule favoring spendthrift trusts, known as the American rule on that subject, see Nichols v. Eaton, 91 U. S. 716; Jones v. Harrison, 7 Fed. (2d) 461; National Bank v. Adams, 133 Mass. 170.

The language used by the testator is plain and unequivocal and leaves no room for construction. His intention is perfectly clear. He provided for the future comfort and happiness of his widow and son in the way he thought best. He desired to protect them against misfortune, perhaps against their own improvidence or lack of business ability. His purpose was that they, and each of them, should receive the income of his trust estate free of any *alienation, encumbrance* or *other disposition* of their interests therein and free of any *anticipation* of or *charge* against said income. "The purpose was lawful, the means proper, and the end laudable." [Matthews v. Van Cleve, supra.] It is our duty, made mandatory by statute and often emphasized in our decisions, to give force and effect to the intention of the testator.

II. This brings us to a consideration of the real issue in this case: *Does the 1913 agreement contravene the intention of the testator?* We think it does. True, this agreement does not provide for any disposition of the income of the trust estate while in the hands of the trustees. But, it does provide that Northrup McMillan *"will promptly pay over and account for"* to the trustees of his mother's estate, one-fourth of all income received by him from his father's estate, and his mother was obligated, by this agreement, to "pay and account for," to his widow, a like amount of said income received by her, in the event she survived him. The testator intended to preserve to them the right to use or dispose of the income of his trust estate as they pleased *after they got it*. This right, they lost by obligating themselves to use or dispose of one-fourth of said income in a certain way *before they got it*. It clearly appears from the language of the agreement and the purpose of the agreement as explained in Eliza McMillan's will, written in May, 1914, and Northrup McMillan's letter to the trustees of her estate, written in April, 1921, that, in making the agreement, they intended to *deal* with the income of William McMillan's trust estate *in advance* and to bind themselves *in advance* as to the *disposition* of one-fourth of said income in a certain way. The agreement, if valid, was enforceable, and precluded any other action on their part as to said portion of said income. Equity considers as done that which should be done. So, for all intents and purposes, the beneficiaries, in making the agreement, *anticipated* the income

to be derived from the trust estate and *disposed* of one-fourth of their respective interests therein. In other words, the agreement, by reason of its legal effect, violates the express terms of the trust. In contending to the contrary, at the hearing of this case in the trial court, learned counsel said:

"That agreement of 1913 was an effort on the part of the mother to take care of certain people that she wanted to leave money to in her will, by getting her son to *give up* a quarter of *what he got* from his father's estate by way of income, and the son, in order to take care of his wife, by getting his mother to *give up* one-quarter of *what she would get* under the will of her husband.

"Now, we have first the will of the father containing this spend-thrift trust. In other words, we admit that that is a spendthrift trust, and we, the wife's representatives, have no right to go to the trustee of William McMillan, the plaintiff, and ask for anything. We claim that under the agreement of 1913 our right is against Northrup McMillan, the son, and *arises only after he gets the income.*

"In other words, we admit that Mr. McMillan left a spendthrift trust, and that we, as the representatives of Eliza McMillan, could not go to that trustee and say we got an assignment or agreement; that we were thrown into the position where *we just had to permit the money to be paid to Northrup McMillan, and then we had a claim against him.*" (Our italics.)

Such is the position of counsel and his associates now, as we read their brief. We agree with counsel in the statement that Northrup McMillan bound himself to *"give up a quarter of what he got from his father's estate,"* and that his mother's representatives *"had to permit the money to be paid to* (him)*, and then* (they) *had a claim against him."* But, in our opinion, the so-called distinction between the 1913 agreement and the 1917 assignment, that is, in legal effect, is a distinction without a difference. By the agreement, Northrup McMillan promised to *"promptly pay and account for,"* to the trustees of his mother's estate one-fourth of the income *"which he may, at any time and from time to time, receive from"* his father's estate. By the assignment, he directed the trustees of his father's estate to pay to the trustees of his mother's estate one-fourth of said income *"which may become due and payable"* to him. So far as the terms of trust are concerned, the legal effect of the agreement and the assignment is the same. To say that the agreement is valid, and to admit that the assignment is void, is to say that the beneficiaries of the trust could accomplish a certain purpose in an indirect way, and to admit that they could not accomplish the same purpose in a direct way. "To permit the beneficiary to do in a ruin-

ous and roundabout way what he cannot do in a straight way, is to play fast and loose with the language of the will and to defeat the testator's intention.'' [Partridge v. Cavender, supra.] The *form* of the transaction is immaterial. ''Any conveyance whether by operation of law or by the act of any of the parties, which disappoints the purposes of the settlor by diverting the property or the income from the purposes named, would be a breach of the trust.'' [1 Perry on Trusts, sec. 386a.]

For these reasons, the agreement was void *ab initio,* and, though Northrup McMillan voluntarily complied with its terms for a long time, out of respect for his mother's wishes, he was never legally bound to do so. Our investigation has failed to disclose a case in which the transaction in issue was of the same character as the transaction in issue here, but, on principle, the authorities cited above furnish ample support for our conclusion in this case.

It follows that we are not in accord with the conclusions reached, nor with the decree and judgment rendered, by the learned chancellor who heard this case below. The judgment is reversed, and the cause remanded with directions to enter a decree and judgment in conformity with the views expressed in this opinion. *Davis, C.,* concurs; *Cooley, C.,* not sitting.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur.