ELECTRICAL WORKERS, LOCAL NO. 1 CREDIT UNION, Respondent,

v.

IBEW–NECA HOLIDAY TRUST FUND, Garnishee-Appellant,

and

Gordon J. Chisholm, Defendant.

No. 61018.

Supreme Court of Missouri, En Banc.

June 27, 1979.

Rehearing Denied July 17, 1979.

Christopher T. Hexter, St. Louis, for garnishee-appellant.

Kenneth J. Feld, St. Louis, for respondent.

WELLIVER, Judge.

This appeal involves a determination of whether respondent Electrical Workers Local No. 1 Credit Union can properly garnish the appellant IBEW–NECA Holiday Trust Fund pursuant to a judgment obtained by Credit Union against IBEW member Gordon Chisholm. The trial court ruled that the Trust was a proper subject of garnishment. The Trust appealed to the Missouri Court of Appeals, Eastern District, which reversed. On respondent's motion, we granted transfer of this cause and now decide it as though on original appeal. Mo. Const. art. V, § 10. Although we agree with the trial court and reach a result different from the court of appeals, we use portions of the court of appeals opinion herein without quotation.

The IBEW–NECA Holiday Fund Amended Trust Agreement, originally established in 1966 pursuant to the collective bargaining Agreement between the St. Louis Chapter, National Electrical Contractors Association and Local Union No. 1, International Brotherhood of Electrical Workers, was amended in 1975 to conform to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.* The Trust Agreement was continued in the 1976 collective bargaining agreement between the IBEW and the NECA.[1]

The stated purpose of the Holiday Fund Trust Agreement is to provide holiday pay benefits for employees (§ 0.02). (Unless otherwise noted, all section references are to the IBEW–NECA Holiday Fund Amended Trust Agreement). Because of the sporadic nature of the occupation, electrical workers often work for several employer-contractors during a year and therefore frequently do not receive payments for holidays. The Holiday Fund Trust Agreement is designed to provide such payments.

Under the Agreement, for each Plan Year, each employer is to contribute to the fund an amount equal to 8½% of his gross monthly labor payroll paid to the employees in the bargaining unit represented by the Union (§ 2.01 and § 6.06 of Agreement between St. Louis Chapter NECA and Local Union No. 1, IBEW, dated June 1, 1976), and also to submit to the trustees, report forms containing the name and social security number of each employee, the hours worked and wages earned by employees for whom contributions are due and the amount of contributions due for the period covered (§ 2.02). Employer contributions to the fund are to be managed and held by a Board of Trustees comprised of three employer (NECA) trustees and three employee (IBEW) trustees (§§ 1.01, 4.01). The trustees also have the authority to invest the funds in their control (§ 4.05). From this fund, eligible employees are to receive both annual and quarterly benefits during any given Plan Year under the Agreement.

To be eligible for these payments, an employee must have worked a minimum of 100 hours during a Plan Year (§ 3.11) and must file a timely application for benefits (§§ 3.15, 3.18). "Each eligible employee shall be entitled to an Annual Benefit in the amount of 4% of the Employee's gross earnings on which employer contributions have been received *in his name* by the Trustees for the Plan Year." (§ 3.14) (Emphasis added.)

As outlined in § 3.17 of the Trust Agreement, the formula for the quarterly benefit is somewhat more complex, taking into account all contributions for quarterly and annual benefits for the Plan Year, investment and other income of the fund, all expenses of the fund including tax liabilities, and any gross earnings on which contributions to the fund have been received for all employees. The result is a quarterly benefit to be paid to the employee in four

---

1. The Agreement is also consistent with § 302 of the Labor-Management Relations Act of 1947, as amended, 29 U.S.C. § 186.

equal installments during the year following the Plan Year (§ 3.19). Nevertheless, under this plan, the amount of the benefits due the eligible employee is based essentially on his gross earnings for and the hours worked during the Plan Year. Between the two types of payments, the entire fund is paid out annually.

On September 10, 1976, respondent Credit Union requested execution and garnishment against the Trust as garnishee of Gordon Chisholm, a member of IBEW, to satisfy a judgment previously obtained against Chisholm. The Summons to Garnishee was served on September 14, 1976, and was returnable on October 11, 1976.

In response to respondent's interrogatories concerning any money or credits of Chisholm in the possession of the garnishee Trust, the garnishee indicated that under § 5.02 of the IBEW–NECA Holiday Fund Amended Trust Agreement, respondent was not entitled to take anything from this fund as a creditor of Chisholm. Section 5.02, which is essentially a standard "spendthrift" provision of the Trust, provides as follows:

> Section 5.02—No Creditor Rights. No benefits or money payable from this Fund shall be subject to any manner of anticipation, alienation, sale, transfer, assignment, pledge, encumbrance by any person claiming or entitled to benefits hereunder; nor shall any benefit payment nor the right to any benefit payment or any interest in this Fund be subject to seizure by any creditor of any person entitled to an interest herein under any execution, writ, or proceedings at law or in equity.

In its Denial of Garnishee's Answer, respondent asserted that garnishee was indebted to Chisholm during the garnishment period and that § 5.02 of the Trust Agreement was not a bar to respondent's right of recovery. The circuit court ruled in the garnishment proceeding that the amount of

$92.14, representing one installment of Chisholm's quarterly benefit, became due and payable by garnishee to Chisholm during the period of the garnishment and that the provisions of the Holiday Fund Trust Agreement were not a bar to recovery of that amount by respondent. Garnishee appeals from that ruling.

■ Although the garnishee Trusts devotes the first point of its brief to assessing the general validity of spendthrift trust provisions in Missouri, the specific crucial issue in this case lies elsewhere. Spendthrift provisions in trusts are clearly valid in Missouri, and such provisions may preclude creditors from seizing the interests of the beneficiaries of these trusts. *Bixby v. St. Louis Union Trust Co.*, 323 Mo. 1014, 22 S.W.2d 813, 820 (1929); *Mullin v. Trolinger*, 237 Mo.App. 939, 179 S.W.2d 484, 488 (1944); *Gentemann v. Dyer*, 140 S.W.2d 75, 78 (Mo.App.1940). However, the creation and application of spendthrift trusts is not unlimited; the spendthrift provision should be upheld only as long as it contravenes neither a statute nor public policy. *Partridge v. Cavender*, 96 Mo. 452, 9 S.W. 785, 786 (1888); *In re Moorehead's Estate*, 289 Pa. 542, 137 A. 802, 806 (1927). Therefore, the crucial question in the instant case is whether the utilization of the spendthrift clause in the Holiday Fund Trust is antagonistic to a statute or public policy of this state.

Before reaching this question we must deal with the garnishee's claim that Missouri statutes and public policy relating to garnishment of payments made under employee benefit plans had been preempted by the enactment of ERISA. We note initially that this is not a situation in which state laws are preempted because of a conflict with federal laws. ERISA clearly preempts the rights of creditors to satisfy a judgment from payments made under an employee *pension* benefit plan.[2] The Trust in this

---

**2.** ERISA's anti-assignment or alienation clause, 29 U.S.C. § 1056(d)(1), which applies only to pension plans, provides that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated."

This has been authoritatively interpreted to prevent creditors from reaching employees' interests under these plans. See Treas.Reg. § 1.401(a)–13(b)(1), reported in 43 Fed.Reg. 6942 (1978), which states that "a trust will not

case is not a pension benefit plan. Therefore, resolution of the preemption issue turns on an interpretation of the general preemption section of ERISA, 29 U.S.C. § 1144, which provides in part:

(a) Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.

In support of its claim that state law is preempted by § 1144(a), garnishee cites *Azzaro v. Harnett*, 414 F.Supp. 473 (S.D.N.Y. 1976). In that case the New York State Insurance Department received an inquiry from a participant in a union pension plan as to his benefit status. The trustees of the pension found obtained an injunction to prevent the Superintendent of Insurance from pursuing the Department's inquiry into the matter. The court noted that ERISA contained provisions allowing participants to inquire directly of the plan administrator as to benefit status (29 U.S.C. § 1025) and placing investigatory power in the Secretary of Labor (29 U.S.C. § 1134). The case stands for the proposition that states may not continue to regulate and investigate pension plans when ERISA provides its own regulatory scheme. However, it does not deal with the effect of § 1144 on state laws which do not purport to expressly regulate employee benefit plans. The question we must answer is whether the Missouri state laws and policies we might wish to apply "fall into [the] narrow category of laws which *affect* employee benefit plans but which do not *relate* to them within the meaning of [§ 1144(a)]." *Stone v. Stone*, 450 F.Supp. 919, 932 (N.D.Cal.1978) (Emphasis supplied.)

Federal courts addressed with the question of what state laws are preempted because they "relate to employee benefit plans" have interpreted 29 U.S.C. § 1144(a) broadly to preempt much state legislation. *See National Carriers' Conference Committee v. Heffernan*, 454 F.Supp. 914 (D.Conn. 1978) (preemption of state tax imposed on employee welfare benefit plans); *Standard Oil Company v. Agsalud*, 442 F.Supp. 695 (N.D.Cal.1977) (preemption of Hawaii Prepaid Health Care Act which required all employees to be insured by plan covering specific illnesses); *Wayne Chemical, Inc. v. Columbus Agency Service Corp.*, 426 F.Supp. 316 (N.D.Ind.1977), *modified* 567 F.2d 692 (7th Cir. 1977) (preemption of Indiana statute extending for disabled dependents the coverage under a group medical insurance policy beyond the limiting age in the policy); *Hewlett-Packard Co. v. Barnes*, 425 F.Supp. 1294 (N.D.Cal.1977) (preemption of California's Knox-Keane Health Care and Service Plan Act regulating health care plans in the state). In interpreting this section broadly, they have relied on the legislative history of § 1144(a) during which the conference committee rejected both House and Senate versions which expressly limited the scope of preemption to areas expressly covered by the bill in favor of a broader version superseding "all state laws that relate to any employee benefit plan." They also place emphasis on comments made during the floor debate of the bill such as that of Senator Javits explaining the change was to avoid "the possibility of endless litigation over the validity of State action that might impinge on Federal regulation . . . and potentially conflicting State laws hastily contrived to deal with some particular aspect of private welfare or pension benefit plans not clearly connected to the Federal regulatory scheme." 120 Cong.Rec. 29942 (1974).

---

be qualified unless the plan of which the trust is a part provides that benefits provided under the plan may not be anticipated, assigned, . . . alienated or subject to attachment, garnishment, levy, execution or other legal or equitable process." This thus *requires* the use of a

spendthrift clause in employee *pension* benefit plans. Even such a clause, however, will not shelter pensions from valid family support claims. *American Telephone and Telegraph Co. v. Merry*, 592 F.2d 118 (2d Cir. 1979); *Stone v. Stone*, 450 F.Supp. 919 (N.D.Cal.1978).

Other courts have been reluctant to invalidate so much state legislation when the intent of Congress is not unmistakably clear. These courts have concluded that § 1144(a) "was not . . . designed to preempt any state law with even the most tangential relation to ERISA." *Stone v. Stone*, 450 F.Supp. 919, 923. In *Stone*, it was held that California's community property laws are not preempted by ERISA insofar as they may affect employee benefit plans by requiring plans to pay part of a participant's benefits to his divorced spouse. This narrower interpretation of § 1144(a) preemption has been applied recently to permit state discrimination laws to indirectly regulate the content of employee benefit plans by requiring plans to offer coverage for pregnancy disability. *Bucyrus-Erie Co. v. Department of Industry, Labor and Human Relations*, 453 F.Supp. 75 (E.D.Wis. 1978); *United Federation of Teachers Welfare Fund v. Kramarsky*, 451 F.Supp. 333 (S.D.N.Y.1978); *Gast v. Oregon*, 36 Or.App. 441, 585 P.2d 12 (1978).[3]

We believe the approach taken by the court in *Gast* is persuasive. There the court was urged to interpret § 1144(a) broadly to preempt an Oregon statute that required employers or labor organizations providing medical and disability benefits to include coverage for pregnancy benefits. The court noted that statements regarding preemption during the floor debate on ERISA were ambiguous, as evidenced by comments by Representative John Dent and Senator Harrison Williams, Jr., that the only purpose of the preemption clause was to eliminate "the threat of conflicting or inconsistent state and local regulation of employee benefit plans." 120 Cong.Rec. 29933 (1974); 120 Cong.Rec. 29917 (1974). The court found no indication in the legislative history of ERISA that Congress intended to preempt areas of state regulation not addressed by

ERISA or to leave such areas totally unregulated, and upheld the validity of the state statute even though it indirectly regulated the content of some employee benefit plans.

■ Title I of ERISA contains five parts. Part one deals with the reporting and disclosure requirements for both pension and welfare benefit plans. Parts two and three apply to only pension benefit plans and establish vesting and funding requirements. Part four sets forth fiduciary standards for both types of plans. Finally, part five contains administrative and enforcement provisions for both types of plans. In summary, ERISA's regulation of welfare plans is not nearly so comprehensive as that of pension plans. It is primarily confined to establishing minimum standards for reporting, disclosure and fiduciary responsibility. ERISA's anti-assignment and alienation provision, 29 U.S.C. § 1056(d)(1) is contained in part two and applies exclusively to pension plans. (note 2, *supra*). The enforcement of state court money judgments by creditors is a valid area of state concern, and is one which is totally unregulated by ERISA with respect to welfare plans. We decline to interpret ERISA to require preemption of Missouri laws in this area, "in the absence of any legislative declaration that Congress intended to create an enormous regulatory vacuum in areas that traditionally have been matters of vital state concern." *Gast*, 585 P.2d at 23.

■ We turn now to a consideration of whether the use of a spendthrift clause in this Holiday Fund Trust violates Missouri statutes or public policy. Plaintiff contends that the payments to employees made from the Trust are wages or earnings, and that to shelter those payments from garnishment contravenes § 525.030, RSMo Supp. 1975.[4] We believe that the payments in

---

**3.** Cases allowing indirect regulation of benefit plans by state insurance and banking laws are distinguishable. *Wadsworth v. Whaland*, 562 F.2d 70 (1st Cir. 1977), *cert. denied*, 435 U.S. 980, 98 S.Ct. 1630, 56 L.Ed.2d 72 (1978); *Old Stone Bank v. Michaelson*, 439 F.Supp. 252 (D.R.I.1977). These cases were decided under 29 U.S.C. § 1144(b)(2)(A) which exempts from

preemption state laws regulating insurance, banking or securities.

**4.** Section 525.030, RSMo Supp.1975 provides in pertinent part:

"2. The maximum part of the aggregate earnings of any individual for any workweek, after the deduction from those earnings of

this case do constitute wages. A paid vacation or pay accumulated by an employer without the interposition of a trust is generally regarded as additional earnings of an employee. *Laborers Union Local 1298 of Nassau and Suffolk Counties Vacation Fund v. Frank L. Lyon & Sons, Inc.*, 66 Misc.2d 1042, 323 N.Y.S.2d 229, 235 (Sup.Ct. 1971); Annot., 30 A.L.R.2d 351. The effect of the use of the trust as a device for collection and allocation of holiday or vacation funds is less clear. Although contributions to a welfare fund are often not technically characterized as wages, they have been held to represent a part of the consideration being given to the workers for their services and have in certain circumstances been regarded as having the same legal effect as wages. Annot., 88 A.L.R.2d 493, 536.

Several cases have considered the question of the nature of the payments involved in employee benefit plans in the context of withholding obligations and priority under the Bankruptcy Act. *Educational Fund of Electrical Industry v. United States*, 426 F.2d 1053 (2d Cir. 1970), dealt with a fund administered by the Vacation Committee of the Joint Industry Board, a fund into which the employers contributed 4% of the weekly production payroll. Payments were made from the vacation fund to the educational fund to be paid employees for voluntarily attending a week long educational school set up for employees. Noting that the payments came from the employers and represented "a portion of the agreed upon remuneration for services performed by the em-

ployees within the intent of Section 3401(a), just as do payments from pension and vacation funds," the court held that such payments were properly characterized as wages for withholding purposes. *Id.* at 1056.

In *In re Otto*, 146 F.Supp. 786 (S.D.Cal. 1956), employer contributions were made to a welfare fund based on hours worked by employees, the fund having been created to provide medical, hospital and surgical benefits and life insurance for employees and their dependents. In finding that such payments were wages for purposes of wage priority under § 64 of the Bankruptcy Act, 11 U.S.C. § 104(a)(2), the district court stated that "[a]n employer's contributions to a welfare fund for the benefit of employees and others, payable in performance of an obligation of the employer under a collective bargaining agreement, and measured on the basis of a certain amount per hour worked by employees, is but another method of computing and paying compensation for services rendered . . . ." *Otto*, 146 F.Supp. at 789.[5] However, this resolution was aided by the fact that the employer contributions to the fund came from setting aside specified portions of cost-of-living wage increases obtained after collective bargaining.

Under the collective bargaining agreement in *Sulmeyer v. Southern California Pipe Trades Trust Fund*, 301 F.2d 768 (9th Cir. 1962), the employer was required to pay monthly 7½% of the gross pay of each employee to the Vacation and Holiday Benefit Fund, administered jointly by the representatives of the Contractors Association

---

any amounts required by law to be withheld, which is subjected to garnishment may not exceed (a) twenty-five percentum, or, (b) the amount by which his aggregate earnings for that week, after the deduction from those earnings of any amounts required to be withheld by law, exceed thirty times the federal minimum hourly wage prescribed by section 6(a)(1) of the Fair Labor Standards Act of 1938 in effect at the time the earnings are payable, or (c) if the employee is the head of a family and a resident of this state, ten percentum, whichever is less.

.    .    .    .    .    .

The term 'earnings' as used herein means compensation paid or payable for personal

services, whether denominated as wages, salary, commission, bonus, or otherwise, and includes periodic payments pursuant to a pension or retirement program."

5. The court also points out that "in the absence of specific exception, employers' health and welfare contributions have been held to constitute wages within the meaning of: the Labor Relations Act, as amended by the Labor-Management Relations Act of 1947, 29 U.S.C.A. § 151 *et seq.*, . . . the Social Security Act, . . . and the Federal Employment Tax Act, 26 U.S.C.A. (I.R.C.1939) § 1426 . . . ." *Otto*, 146 F.Supp. at 789.

and the Union. The contractor made all necessary legal withholdings prior to the payment to the fund. The court held that for the purposes of the Bankruptcy Act these contributions were wages because they were keyed to hours worked, the employees had a vested right in the contributions paid and the payments were to be made by the employer only after he had made all the necessary withholdings.

The present Holiday Fund Trust bears several similarities to the trusts in the three cases just cited. Both the contributions made by the employers to and the payments made to the employees from the trust fund are proportioned to the hours worked by the employees, as were the contributions in both *Otto* and *Sulmeyer.*

Secondly, to qualify for payments from these funds, an employee needs only to have worked a minimum of 100 hours for NECA employers during the Plan Year, and have filed a timely application for the benefits offered under the Agreement. Once these eligibility requirements are met, the employee, or if he is deceased, the employee's "beneficiary," has a right to receive the accrued benefits for that year (§ 3.04). The trustees have no discretion as to either the fact or the amount of payments. The formulas for the benefits are to be applied so as to deplete the funds available for the benefits, to be paid at the close of each Plan Year (§ 3.05). The fund is one providing benefits which the employees are certain to receive, and not one providing benefits "which might or might not be obtained by the wage earner." *Sulmeyer,* 301 F.2d at 771.

A third aspect of the Holiday Trust Fund indicating that these payments are wages may be found in § 3.03 of the Agreement, which requires the trustees withhold from payments to employees all Federal, State and City taxes, as well as pay from the fund any employer liability for FICA and FUTA.[6] "Such deductions are indicia of wages." *Sulmeyer,* 301 F.2d at 771.

■ Finally, the general purpose of the Holiday Fund Trust "to provide holiday pay benefits for employees" supports the characterization of these benefits as wages or earnings. The benefits conferred through the fund substitute for "paid holidays" received by those who work for a single employer, and should carry the same designation as wages or earnings. The fund and the payments through it are part of the remuneration agreed upon by the parties in their collective bargaining agreement. *Educational Fund of Electrical Industry,* 426 F.2d at 1056. The fact that the employee is not entitled to benefits until he has worked 100 hours does not remove these payments from the scope of the statute providing for garnishment of wages or earnings. In the light of the cases we have discussed and the various factors which are characteristic of wages, we conclude that the payments in this case are in the nature of wages or earnings within the meaning of § 525.030, RSMo Supp.1975.

■■ The characterization of these payments as wages or earnings does not preclude the fund Agreement from being a trust under the law of Missouri. Under the Agreement there are identified beneficiaries, trustees, a sufficiently described and identifiable trust *res* and an actual delivery of the trust corpus. The requisites of an express trust in Missouri are thereby met. *Potter v. Winter,* 280 S.W.2d 27, 33 (Mo. 1955). Other factors further define the nature of this fund as a proper trust, and the

---

**6.** While it is the trustees who withhold rather than the employers, we do not consider this factual difference between *Sulmeyer* and the present case to be significant. Under § 3.03 of the IBEW–NECA Holiday Fund Trust Agreement, "[t]he Trustees shall withhold from payments made to employees, all required Federal, State and City taxes. The Trustees shall pay from the Fund any *Employer* liability for the Federal Insurance Contributions Act or the Federal Unemployment Tax Act (if any) on

benefits paid." (Emphasis added.) Treasury Regulation § 31.3401(d)–1(f), which implements the provisions for withholding in the 1954 Internal Revenue Code, as amended, 26 U.S.C. § 3401, provides that a trust is an "employer" where wages, such as certain types of pensions and retirement pay, are paid by the trust and the person for whom the services were performed had no legal control over the payment of such wages.

payments therefrom to employees as valid "trust interests."[7] The Agreement in § 5.01 provides that the title to all property in the fund is to be vested in and remain exclusively with the trustees until payment to the employees. The trustees have complete control of the fund and have power to make investments and the income from such investments are added to the fund from which employee benefits are paid. The trustees have the exclusive authority to bring suit to enforce the employers' obligation to contribute to the fund and to distribute benefits to the employees. The fact that the corpus of the trust is comprised of payments from employers does not by itself render the Holiday Fund Trust contrary to state statute or public policy. The Trust is valid.

Conceding both the characterization of the payments as wages and the general validity of the Trust, the remaining issue is whether the spendthrift clause is contrary to statute or public policy.

Respondent contends that § 525.-030 RSMo 1975 Supp., authorizes the garnishment of wages and earnings and that a spendthrift provision which purports to prevent such garnishment is contrary to that statute and is thereby contrary to public policy. We agree. Section 525.030 sets the maximum amounts of a judgment debtor's wages which may be garnished. Extending greater protection then that afforded by the statute to some wage earners, but not to others, would violate the intent of that statute. The cases cited by the garnishee Trust as upholding spendthrift clauses in other jurisdictions are not persuasive. Most of these deal with pension plans, and while payments made under a pension plan are specifically included within the scope of § 525.030, we recognize that Missouri laws affecting creditors' rights to such payments are preempted by ERISA. (note 2, *supra*).

Furthermore it is hornbook law that a person may not create a trust for his own benefit and include a provision restraining the rights of his creditors. G. G. Bogert and G. T. Bogert, Handbook of the Law of Trust, § 40 at 154–55 (5th Ed. 1973). Restatement (Second) of Trusts § 156 (1959). This has long been the law in Missouri. *Jamison v. Mississippi Valley Trust Co.*, 207 S.W. 788 (Mo.1918). In this context, we find no justification for permitting a person to do indirectly that which we cannot do directly. If a spendthrift clause such as this were to be held enforceable, who is to say that all wages of employees could not be sheltered from the claims of creditors by similar agreements.

The spendthrift clause is invalid. This does not affect the validity of the Trust Agreement itself, which we recognize as having been created for a valid purpose.

Judgment affirmed.

All concur.

---

7. The New York Supreme Court identified several such factors in *Laborers Union Local 1298 of Nassau* and *Suffolk Counties Vacation Fund*, which dealt specifically with the attempted garnishment of an individual's share in a vacation fund trust created as a result of a collective bargaining agreement between contractors and a union representing general laborers. The court found that because the payments were a "trust interest" they were not earnings subject to garnishment under New York statutes defining and limiting the scope of spendthrift provisions. While we view the fund in the instant case as a trust interest, the protection of the fund from the reach of participants' creditors is not warranted under Missouri statutes.