# Moorehead's Estate.

*Trusts and trustees—Spendthrift trust—Support of wife out of cestui que trust's income—Desertion and misconduct of husband—Husband and wife—Wills—Public policy.*

1. The duty of a husband to support his wife is not dependent on contract.

2. The duty of a husband to provide for and protect his family becomes a duty upon his marriage, and not a debt.

3. The words "creditors," "contracts," and "debts" as used in a spendthrift trust provision in a will, will not be construed as protecting the income of the trust from the claim of the cestui que trust's wife for support, where it appears that the husband had deserted his wife without contributing to her support, had. contracted a bigamous marriage with one woman and lived in adulterous relations with another, and that a consideration of the whole will of testatrix and of the circumstances attending its making, showed that testatrix had no intention of depriving the wife of support.

4. In such a case, to deprive the wife of support out of her husband's income would contravene every principle of public morals and public policy, and if a will be construed to permit such thing it would be held illegal for that reason.

Argued March 17, 1927. Before MOSCHZISKER, C. J., FRAZER, WALLING, KEPHART, SADLER and SCHAFFER, JJ.

Appeals, Nos. 37 and 43, March T., 1927, by Joseph M. Browne and James R. Sterrett et al., trustees, and by Gertrude F. Moorehead, from decrees of O. C. Allegheny Co., June T., 1925, No. 453, dismissing exceptions to decrees granting and continuing an injunction in estate of Mary H. Moorehead, deceased. Affirmed.

Exceptions.to decrees granting and continuing injunction. Before TRIMBLE, J.

From the record it appeared that Gertrude F. Moorehead, wife of William H. Moorehead, grandson of testatrix, petitioned the orphans' court for an injunction to restrain trustees under the will of testatrix from paying

out income from a spendthrift trust, created for her husband, and to pay a proper amount of such income over to her for her support.

The court granted an injunction and continued it until the petitioner should enforce her rights in the common pleas. It made no order on the trustees to pay money over to the petitioner. Both the trustees and Gertrude F. Moorehead filed exceptions to the decrees. Exceptions dismissed. The trustees and Gertrude M. Moorehead appealed.

Other facts appear by the opinion of the Supreme Court.

*Errors assigned,* inter alia, were the decrees.

*Charles Alvin Jones,* with him *Sterrett & Acheson,* for Joseph M. Browne and James R. Sterrett, trustees under will of Mary H. Moorehead, deceased. The trust for William H. Watt, created by the will of Mary H. Moorehead, deceased, is a valid spendthrift trust: Thackara v. Mintzer, 100 Pa. 151; Board of Charities v. Lockard, 198 Pa. 572; Morgan's Est., 223 Pa. 228; Com. v. Thomas, 65 Pa. Superior Ct. 275.

The right of property in respect of the income from this spendthrift trust in the hands of the trustees is the right of the testatrix and not the right of the beneficiary: Morgan's Est., 223 Pa. 228; Thackara v. Mintzer, 100 Pa. 151; Board of Charities v. Lockard, 198 Pa. 572; Com. v. Thomas, 65 Pa. Superior Ct. 275.

The creation of a spendthrift trust has been deemed to protect the income therefrom in the hands of the trustees from all kinds of debt owing by the beneficiary, including judgments or decrees against him for support.

The lower court erred in holding that Everhart v. Everhart, 87 Pa. Superior Ct. 184, ruled the case at bar.

The provisions of the Orphans' Court Act of June 7, 1917, P. L. 363, confer no jurisdiction on the orphans'

court to make an allowance or order for support in favor
of a wife against her living husband.

*George H. Calvert,* of *Calvert, Thompson & Berger,*
with him *Harbaugh Miller,* for Gertrude F. Moorehead.
—Beneficiary's obligation to support his wife is not a
contract or debt: Thackara v. Mintzer, 100 Pa. 151;
Board of Charities v. Lockard, 198 Pa. 572; Bender v.
Bender, 226 Pa. 607; Long's Est., 228 Pa. 594.

The orphans' court should have directed payment by
the trustees to appellant: Ellwanger v. Moore, 206 Pa.
234; Mahoney's Est., 46 Pa. C. C. R. 485; Moorehead's
Est., 27 Pa. Dist. R. 15.

OPINION BY MR. JUSTICE FRAZER, May 9, 1927:

Gertrude F. Moorehead presented her petition to the
Orphans' Court of Allegheny County, asking that the
trustees under the will of Mary H. Moorehead, late of
that county, be required to pay petitioner out of the in-
come in their hands payable to her husband, a sum suffi-
cient for her support and maintenance, and that in the
meantime the trustees be restrained from making pay-
ments to the husband. The court below held the hus-
band liable for his wife's support, and directed that the
injunction previously issued against the trustees be con-
tinued for thirty days, to enable petitioner to issue an
appropriate writ to secure the amount due her. Both
petitioner and the trustees appealed. These appeals in-
volve the same question and will be disposed of in one
opinion.

By the last will and testament of Mary H. Moorehead
she constituted William H. Moorehead, formerly Wil-
liam H. Watt, before his adoption by testatrix and her
husband, her grandson, a life beneficiary of a part of her
residuary estate. By the terms of the will the income
from this estate received by trustees named by her was
to be paid "semi-annually or oftener," to the beneficiary,
and by a codicil she subjected the corpus and the income

of that portion of the estate to the following restrictions:

"I will and direct that neither the income payable to my grandson, William H. Watt, nor the corpus from which the same is derived, shall be liable to or for the contracts or debts of said William H. Watt, or to execution or to attachments at the suit of any of his creditors; but shall be absolutely free from the same, and he shall have no power to sell, assign or encumber the same or any part thereof, or to in any way anticipate the said income."

On May 4, 1903, H. Watt Moorehead and Gertrude F. Moorehead were married, and she is still his lawful wife. On October 24, 1914, he deserted her without cause, removed from the community in which they had resided, and his whereabouts were unknown until located in Erie, Pennsylvania, where he committed bigamy by an unlawful marriage with a young woman, whom he soon after deserted. Later he was discovered in California. During this period of desertion from his lawful wife, which continued until September 21, 1916, a bill in equity was filed by the wife in the Court of Common Pleas of Allegheny County, Pennsylvania, against the trustees and the absent husband, praying for suitable maintenance for herself, and in that proceeding a decree was entered September 21, 1916, against defendant Moorehead, but not against the trustees, ordering him to pay to his wife the sum of $7,000 annually in equal semi-annual installments. On the date of this decree, September 21, 1916, defendant resumed marriage relations with his wife and remained with her until July 21, 1924, when he again deserted her without reasonable cause, and his whereabouts were unknown until he was discovered in Baltimore, living in adulterous relations with his wife's sister-in-law, who had left her husband and, she and Moorehead were found living in the same criminal relation in Chicago, where they resided in an apartment largely fitted up with furniture belonging to

his lawful wife. Again, he disappeared, locating himself in places unknown to his wife, and his whereabouts continued unknown at the time of these proceedings in the orphans' court, from the decree in Appeals were taken by both the trustees and husband from the injunction decree. Having been made a party to the proceedings and served with notice by advertisement, the husband has communicated with the trustees and their attorneys through go-betweens, who have not divulged his place of hiding, which seems to be somewhere in the eastern part of the country. Under the decree of the court of common pleas, referred to above, there was due and unpaid to his wife on July 1, 1926, a total sum of $17,500. The aggregate income arising from the trust created by the will of his grandmother is approximately $20,000 a year, and at the date of the decree by the court of common pleas there was in the hands of the trustees $29,000.

We find in the brief of the trustees this statement: "The testatrix for reasons sufficient unto herself, in disposing of her own property, saw fit to impose the restrictions in respect of the trust estate for William H. Moorehead, whereby all of his creditors, present or prospective, and including his then wife, would be forever barred from taking any of the testator's property out of the hands of her trustees to discharge the beneficiary's debts or liabilities." On the other hand, the wife's attorneys in their brief say: "Under these circumstances it seems only reasonable that the testatrix actually intended the trust fund which she was creating to be for the benefit of both her grandson and his wife."

If this will is to be considered and construed only in the light of the precise terms by which the trust in favor of Moorehead is created, and it is very obviously so considered and construed by counsel for respondent, it may be admitted that all controversy would at once be put to an end. The clause and codicil have certainly created a trust. It might indeed from such restricted interpretation be properly held to be the intention of tes-

tatrix, as is contended, to prevent the application of any part of the income to the support of the wife of respondent in any contingency. But does the will, by all its terms and provisions, taken in its entirety, admit of such a conclusion? Are there not, in parts other than the clause establishing the trust and the codicil setting forth the restrictions, intendments vitally necessary for consideration to arrive at the actual intention of testatrix with regard to this trust? Not only do we believe there are, but we view the will as signally prolific in expressions which show unmistakably that at the time testatrix executed it, there was distinctly in her mind the welfare of the wife of her grandson, and that there was in fact no intent on her part to empower, if that were possible, her grandson to refuse the commonest claims of his wife, if ever he should choose to indulge in such defiance. To discover, however, that such was her intention, not only must the will be examined as a whole, but the circumstances surrounding testatrix at the time of making it must also be taken into careful consideration. In Postlethwaite's App., 68 Pa. 477, 480, this court said: "It has been long and well settled, and indeed it is a principle so consonant to reason that the only wonder is that it should ever have been questioned, that all the surrounding circumstances of a testator—his family, the amount and character of his property—may and ought to be taken into consideration in giving a construction to the provisions of his will," and in Stambaugh's Est., 135 Pa. 585, 597, we said "that we must search only for the intent of a testator within the four corners of the will. This is true, but, when we come to consider the will and interpret its meaning, we must do so in the light of all the circumstances by which the testator was concerned when he made it, and by which he was probably influenced."

Construing this will then as a whole and giving adequate attention, in conjunction with the examination of its terms, to the circumstances attending testatrix, and

which concerned her, we are unable to avoid the conclusion that when she hedged in the trust in favor of her grandson with the restrictive words employed, she had in mind only contracts or debts ordinarily made and incurred in usual contractual or financial transactions. Undoubtedly she meant to create a spendthrift trust. Her purpose in this is manifest, as it is obvious in practically every instance of the creation of similar trusts, viz., to protect the object of her bounty from wasting his income by his extravagance and dissipation; and certainly the career Moorehead followed and has continued to follow furnishes ample justification for these protective inhibitions. But that it was her intent to deliberately enable him to unlawfully deprive his family of the necessary care, protection and support which by law he owed them, neither the terms of the will nor the circumstances attending testatrix at the time of making it, permit. The very fact that the name of the wife of her grandson is not mentioned is in itself evidence that such a contingency was not in the mind of testatrix. Determined as she was to protect her grandson from the effects of his own folly and extravagance in his relations with people in general, would she not, had she intended to include the wife within the range of the trust inhibitions as to contracts and debts, have added a provision to that effect? It will be informing to give attention to dates and events relative to and connected with the execution of the will. It bears date June 13, 1903. The codicil by which she surrounded the trust with restrictions against the liability of her grandson for *contracts and debts,* was added January 21, 1905. The testatrix died August 21, 1908. The marriage of her grandson took place May 4, 1903. It will thus be seen that the will and codicil were both executed subsequent to the marriage, the first less than two months after and the codicil a year and six months later. She continued in life for five years following the marriage, and we find nowhere in the will the slightest intimation of animosity on her part

toward the wife of her grandson, and if after a period of
five years' association with the young wife, the latter's
future welfare and happiness had become in the mind of
testatrix a matter of indifference, assuredly not one
word in the will provides the slightest evidence of such
unconcern.  On the contrary, we find by the language of
the will itself, and by noting its general tenor of kind-
ness, love and solicitude for those testatrix was leaving,
that, while she made no direct reference to the wife of
her grandson, she had her solicitously in mind when she
executed the will.  Taking all the clauses and the codicil
into consideration, we do not find one expression which
breathes other than the most tender regard and anxiety
for the well-being of her relatives and friends.  That, in
fact, is a plain characteristic of the entire document, and
hence to reach the intention of testatrix it becomes nec-
essary to interpret it in this inclusive sense.  We said, in
Hood v. Penna. Society, etc., 221 Pa. 474, 480, "There is
no sound reason in the nature of things why the actual
meaning of the person using the words should not be
sought in the case of a will exactly as it is in the case of
a contract"; and this principle applies whether the
meaning sought is to illuminate the actual disposition
of a testator in his will towards a particular thing, or
to bring out his intent as to words or declarations when
it is a question of the mental or emotional attitude of
the testator concerning those with whom he was dealing
when making his will.  Looking at the will then with
these principles of construction in view, we find that in-
stead of there being a studied purposeful exclusion of
consideration for the young wife of her grandson, there
was a gracious and intentional inclusion, by the words of
the will itself, in the loving and tender farewell with
which she concludes the document.

"I hope you may live an undivided happy family, and
think of me always as being your devoted and loving
grandmother, sister and friend, and hope and expect to
meet you *all* on the other shore, where parting is no

more, is the wish of one who has tried to make you all happy."

That is not the prayer of a woman whose intention was to encourage a grandson in the lawless abandonment of his lawful wife and to exult over the privations, the misery and the humiliations which she must suffer as the fruits of such desertion. Is it to be conceived that this aged woman, her thoughts freighted with the tenderest solicitude for *all* her loved ones,—and she herself has italicized the enlightening word *all*,—whose large intelligence enabled her to know the full range of meaning of the words used in her will, could have deliberately intended and required that among all those upon whom she left her final friendly benediction, there was one, the young wife of her grandson, upon whom that last and gentle blessing should not rest? We cannot find in her will any word or phrase that permits even an intimation of so strange an intention.

But it may still be contended that, even though she did have in mind the welfare and happiness of her grandson's wife, nevertheless an inflexible interpretation of the terms of the will creating the trust compel the conclusion that not only is this respondent rendered exempt from paying his just debts, but in addition is clothed with the right and power to reject all responsibility for the application of any part of his income from the trust to the care and support of his deserted lawful wife, while at the same time, by the aid of the generous bounty of testatrix, he may revel in luxury, commit crimes that disgrace and degrade him as a husband and citizen, and, from his various places of hiding, deign to give some small recognition to the proceedings instituted against him in the courts, by means of selected go-betweens. If it be so contended, we answer, there remains a great controlling factor which cannot be justly avoided or ignored in the settlement of this particular case. That factor is found in the fact that there have arisen in this proceeding circumstances not provided for by testatrix

in her will, because not anticipated by her, which in themselves and in their results, plainly contravene the principles of public morals and public policy in their most general and significant application. A testator has a right, as was said in Broadway Nat. Bank v. Adams, 133 Mass. 170, "to dispose of his own property with such restrictions and limitations, not repugnant to law, as he sees fit, and his intentions ought to be carried out, unless they contravene some positive rule of law or are against public policy." No hard search is required to find in this will an abundance of reasons for declaring that, to place upon it the interpretation respondent says it should have,—a construction, as we have said, the will in its entirety does not allow,—would be to place it in direct antagonism to every recognized claim of morality and to every purpose of public policy. To ignore or dismiss this controlling factor would be to attach the seal of judicial approval to the misconduct of this respondent against his deserted wife and grant him a commission of right to continue those offenses and persist in his career of shamelessness and criminality, in which the crimes of bigamy and adultery signal his triumphs as a violator of law and of public morals. Such conclusion would be to transform his wickedness into a weapon for further use against a defenseless wife. Of this respondent the learned trial judge has said in his opinion, on entering the decree from which this appeal was taken:

"The respondent in this case is a common scamp, a demoralizer and debaucher of women, having during the time of his marriage contracted at least one bigamous marriage......He has outlawed himself and chosen to be an outcast from decent society, and remains in hiding some place in the east."

Public policy is not so vague and wavering a matter as not to be rightly invoked in a case of this character, where the degenerating tendencies of marital relations of the present day are so faithfully exemplified by one who comes into court and demands judicial condonation

of his violations of law. In every civilized country is recognized the obligation, sacred as well as lawful, of a husband to protect and provide for his family, and to sustain the claim of the husband in the case at bar would be to invest·him with a right to be both a faithless husband and a vicious citizen. This case reaches beyond the concern of the immediate parties to it. It affects the status of the family as being the foundation of society and civilization, and hence in a very certain sense is of wide public concern.

"The marriage contract once entered upon, becomes a relation rather than a contract and invests each party with a status towards the other and society at large, involving duties and responsibilities which are no longer matter for private regulation, but concern to the Commonwealth. And in this aspect marriage is a social institution, publici juris, being the foundation of the family and the origin of domestic relations of the utmost importance to civilization and social progress; hence the State is deeply concerned in its maintenance in purity and integrity": Coy. v. Humphreys, 125 S. W. 877.

There is still another great factor to be considered in this case, the legal unity of husband and wife, and it is a unity which must continue to be recognized, however much modern laws enlarge the separate rights and privileges of each. And with this merger of existence and interests, established from the most ancient times in all civilized lands, how can it be claimed that the status of creditor and debtor is established between them, when it is a question of the mutual performance and fulfillment of fundamental duties as husband and wife, which the obligations of humanity impose and the safety of society requires from both?

"The marriage contract has not the elements of ordinary contractual relations. That contract is a life contract, imposing upon the husband the support and maintenance of the wife in sickness and in health during life,

contingent only on the termination by decree of court for statutory reasons": Keezer on Marriage, section 55; "The duty of the husband to support the wife is not dependent upon contract": 30 C. J. 517.

These are accordingly primal obligations under the marriage relation imposed immemorially upon the husband, and which do not fall within the range of the nature or the meaning of a debt. Every debt of course is an obligation; but every obligation is not a debt: Sonnesyn v. Aiken, 97 N. W. 557. A debt is a sum of money due by contract, express or implied. But a tax is not a debt. It is not founded upon contract. It does not establish the relation of debtor and creditor between the taxpayer and the State: Perry v. Washburn, 28 Cal. 318. When an alien secures citizenship it becomes his duty to support and protect the Commonwealth as far as possible. But he has made no contract to that effect. Similarly the duty of a husband to provide for and protect his family becomes a duty upon his marriage, a fundamental duty, not a debt.

If we have gone at length into this discussion, it is for the reason that, in the case at bar, we find a husband utterly devoid of a sense of moral or legal responsibility as to his status as a husband, one who defiantly sets at naught all the moral and legal powers that govern him in that status, and, while revelling on the bounty of his benefactor, denies the authority of law and courts to compel him to assume and fulfil the fundamental duty of a husband toward his wife, such as her mere just rights and needs require. Certainly property available for the purposes of pleasure or profit should be also answerable to the demands of justice: Tillinghast v. Bradford, 5 R. I. 205.

Conformably to what has been said above, we are of opinion that testatrix intended that the terms she employed in her will to create a trust in favor of her grandson should be understood and used in the sense in which such words are ordinarily understood and used, and that

she did not contemplate or intend that the words "contracts or debts" should apply to and include those natural obligations and duties which a husband, in the light of humanity, of sound social order and by the requirements of the law, owes to his wife. The words "contracts" "debts" and "creditors," under the circumstances of this case should be restricted as originally employed and not extended to deprive the wife of her support.

The decree of the court below is affirmed and the injunction continued for thirty days from this date, to enable counsel for Gertrude F. Moorehead to secure by proper legal process the amount due her. The costs to be paid by the trustees out of the income due William H. Moorehead.