## Bonsall Estate

258

*Rodney T. Bonsall,* for exceptants.
*Guckes, Shrader & Burtt,* contra.

BOLGER, J., October 27, 1948.—The auditing judge, in holding that the Act of June 1, 1945, P. L. 1337, does not authorize the termination of spendthrift trusts created prior to the date of enactment, relied upon Harrison's Estate, 322 Pa. 532, and the precedents cited therein. They decide that the abrogation of a testator's right to protect his heirs from a presumed incapacity to manage inheritance can only be accomplished by express, definite and positive enactment. However, the principle of Harrison's Estate, which was decided in the year 1936, was changed by the Statutory Construction Act of 1937, P. L. 1019, sec. 58: "The rule that laws in derogation of the common law are to be strictly construed, shall have no application to the laws of this Commonwealth hereafter enacted."

The majority of the court find no difficulty in identifying the twofold subject matter of the Act of June 1, 1945, P. L. 1337. Sections 1 and 2 refer to two distinct aspects of the law of property—"powers" and "interests". The Act of May 28, 1943, P. L. 797, of which the Act of 1945 is an amendment, dealt only with disclaimers of powers of appointment. The learned auditing judge's assertion that the reference in section 1 of the Act of 1945 to certain exceptions to the subject of powers and his discussion of a power in trust that is imperative should not be confused with the subsequent language dealing with "any interest in, to, or over, real or personal property, . . . in the nature of a so-called spendthrift trust, . . . may be released or disclaimed . . . by written instrument . . . by the person possessing the . . . interest . . .". Section 2 of the act, to which the auditing judge does not advert, is likewise unambiguous. In italicized language, it refers to an *"interest"* which, like a power is "releasable *or disclaimable under section one hereof,* may be released *or disclaimed* either absolutely or con-

ditionally, and may also be released *or disclaimed* with respect to the whole or any part of the property subject to such power *or interest,* and may also be released *or disclaimed* in such manner as to reduce or limit the persons or objects or classes of persons or objects in whose favor such power or interest would otherwise be exercisable, *except that no power or interest, subject to a spendthrift trust provision, or similar provision, may be released or disclaimed except in favor of a remainderman . . .".* The second section thus appears to be not merely the implementation of section 1, but also a limitation upon it, whereby the beneficiary of a spendthrift trust can disclaim or release only as to a remainderman. The auditing judge's indictment of this act is that "nowhere does it say that upon such release or disclaimer a spendthrift trust may be terminated". The object appears to mean that the conclusion must be stated expressly even though all of the other elements of the formula or proposition be clearly stated. With this we disagree.

To the majority, two things are apparent, that by section 1 the legislature clearly expressed the intent that spendthrift trusts were releasable, and in section 2 the form which such releases must take and the extent to which they can be taken, are just as clearly expressed. The language is not as clear as that contained in section 2 of the Estates Act of 1947, to which the auditing judge refers: "The court having jurisdiction of a trust, regardless of any spendthrift or similar provision therein, in its discretion may terminate such trust in whole or in part. . . ." Yet, we conclude that, considering the broad field of law covering spendthrift trusts and its many facets, the legislation authorizes the release or disclaimer by a life tenant of a spendthrift trust, or it means nothing. Were the act to state broadly that the life tenant of a spendthrift trust could release or disclaim his interest in favor of

a remainderman, as the adjudication would appear to require, it would not be accurate because only partial and not complete abrogation is intended. All of the essential elements involved are clearly stated even though there be no express statement made of the conclusion constituting the sum of all of the elements. But, two and two will always add to four. Therefore, the absence of a statement of the conclusion is not fatal. There are some defects in the act, e. g., there is no provision for accelerating remainder interests. However, that defect can be overcome by skilled draftsmanship of instruments executed after the enactment of the act and, therefore, should be considered vital only as to the retrospective aspects of the act.

Two other important questions present themselves: (1) Did the legislature intend the provisions of this act to be retroactive? (2) If so, was the legislation unconstitutional?

In seeking the intent of the legislature as to the retroactive application of the act, we find that only one word of one section of it invites such possibility.

Section 4 provides that the act "shall apply to releases and disclaimers heretofore and hereafter delivered". We refer to the Statutory Construction Act of 1937, P. L. 1019, to guide us. Article IV, sec. 58 of that act provides: "All provisions of a law of the classes hereafter enumerated shall be strictly construed . . . (2)".

Retroactive provisions, section 51 provides, inter alia:

"When the words of a law are not explicit, the intention of the Legislature may be ascertained by considering, among other matters—the occasion and necessity for the law; . . . (3) the mischief to be remedied; (4) the object to be attained . . . (6) the consequences of a particular interpretation."

Section 52: "Presumptions in Ascertaining Legislative Intent—In Ascertaining the intention of the Legislature in the enactment of a law, the courts may be guided by the following presumptions, among others: (1) That the Legislature does not intend a result that is absurd, impossible of execution or unreasonable."

Section 56: "Presumption Against Retroactive Effect—No law shall be construed to be retroactive unless clearly and manifestly so intended by the Legislature."

Let us examine the effect of the retroactive application of this upon spendthrift trusts currently existing. Ordinarily, there are but two beneficiaries of a spendthrift trust—the life tenant and the remainderman. Many of them, however, have substitutionary life tenants as well as substitutionary remaindermen whose interests may vary in existing trusts anywhere from being possibilities to being vested in interest. The complications arising from the authorization of existing life tenants to waive their interest include the taking away from the substitutionary life tenants of their possible interest as well as of creating serious problems respecting which remaindermen may be the favorite of the waiving life tenant. These are only a few of the many difficulties which one can envision.

It is horn-book law and, therefore, needs no citation that spendthrift trusts are peculiar favorites of the law of this State. The inability of beneficiaries or of their creditors to alter the terms of any one of thousands of existing spendthrift trusts is proverbial. Hardly any other principle of law is so firmly imbedded in our State's jurisprudence nor can we find another in the operation of which the courts have been so zealous in protecting property rights. Our civilization under the free enterprise system depends for its successful operation upon the stability of property rights not the least

of which is one's ability to dispose of his property as he sees fit. To undermine that doctrine would be to invite attack upon all rules of property as well as of contract and would, therefore, be subversive. In other words, the impact of the retroactive operation of this act would be revolutionary and, therefore, unreasonable if not absurd. In our opinion, the phraseology of the legislation does not have the requisite clarity and manifest purpose to accomplish this broad result.

The single word "heretofore" is not adequate in our opinion to convey such intention. Section 4 refers to releases and disclaimers. It omits many elements of clarity and manifest intention. It does not refer specifically to spendthrift trusts; nor does it make any express provision for the application of the doctrine of acceleration. While the act authorizes the life tenant to waive his interest only in favor of a remainderman, it does not expressly make the latter his substitute. It, therefore, would create new problems of construction which testator did not contemplate and for which he made no provisions, and which, therefore, might result in his bounty being bestowed upon persons and at times other than he intended.

Legislative practice does not attest to such revolutionary changes in property rights especially when the provisions of a piece of legislation invite attack upon constitutional grounds. The legislative policy likewise never contemplates disturbing the fundamental law unless the intention be in clear and unmistakable terms.

Retroactive application would be inconsistent with legislative practice. Many instances could be cited to demonstrate that the legislature rarely undertakes such drastic action and that when it does so, its manner is thorough and unmistakable.

The final reason is that retrospective application of the act would be an open invitation to the perpetration

of wholesale fraud and collusion upon the rights of creditors of life tenants of many existing spendthrift trusts. Many of the latter have exhausted efforts to reach their debtors' interest in the particular estates due to existing law. They have, therefore, been lulled into quiescence. Others, less aggressive, have permitted their claims to become outlawed. The life tenants would now be permitted to secretly contract to sell their interest with or without the connivance of the remainderman, have the trust terminated and distribution made to the latter without notice to possible creditors. The phrase "with or without consideration" in section 1 of the act is practically a solicitation for such action. Such a result would be so absurd and unreasonable as to come within section 56 of the Statutory Construction Act, supra. Prospective application, on the other hand, would not invite such results because the act itself is adequate notice to all parties, conveyors, beneficiaries and creditors; they can therefore take adequate steps to protect themselves against such possibility. Reliance upon this casual use of the word "heretofore" is too insecure a basis to support such violence to property rights.

In discussing the constitutional question, it should be stated, in limine, that constitutionality of a statute is never properly before a court unless it is absolutely necessary to the decision of the cause: Commonwealth, etc., v. Picard et al., 296 Pa. 120. However, since there may be differences respecting the decision of the case, based upon legislative intent as to retroactive application of the act, we proceed to a decision on constitutionality.

Fundamental questions are also presented in the constitutional implications of the retroactive aspects of this act. Does it offend article I, sec. 9, of the Constitution of Pennsylvania in that it takes property other than by "the law of the land"? Those questions

depend upon whether testator was at the time of the enactment possessed of property rights. It is argued a dead man cannot own property. In the long line of cases, which have imbedded spendthrift trusts deeply in our legal system, the property interest of the donor of an inter vivos trust and of testator of a testamentary trust commonly called the conveyor, has been held to extend over and beyond the act of conveyance to and including the execution of the terms of the trust. Counsel for exceptant counters with the suggestion that Holdship v. Patterson, 7 Watts 547, which he contends was the source of this doctrine, involved a deed of trust; that the conveyors were alive at the time the contest arose and, therefore, remained possessed of the right to have the trust terms enforced and that our appellate and other courts have mistakenly applied the doctrine to testamentary trusts—mistakenly, because a dead man cannot own property.

This reasoning requires an examination of the status of wills. Maginn's Estate, 278 Pa. 89, 98, states:

"While the practice of allowing the owner of property to dispose of it after death is of very ancient origin (Genesis 48:22), it did not exist in certain nations (4 Kent 502), and, in England, until a more recent period, was exercised under considerable restrictions: 2 Blackstone's Com. 492. It is not a constitutional or natural right, but a creature of statute law, and as such it must be governed: Kirkpatrick's Estate, 275 Pa. 271; Frick's Estate, 277 Pa. 242. The state prescribes a form within which a testator's acts may be reasonably safe, but it must be followed."

Blackstone in Book 2 refers to Noah's disposal of the whole world in his testament and of Jacob's preference of Joseph. He comments, "With us in England this power of bequeathing is coeval with the first rudiments of the law for we have no traces or memorials of any time when it did not exist." Thompson on Wills,

par. 17, refers to transfer of property at death as a privilege and not a right conferred by the legislature, that it may be withdrawn entirely or qualified at any time by the same agency. Paragraph 26 states, however, that once the power is created by the legislature and it is exercised to comply with the form and extent permitted by the legislature, the manner of the execution of the will and the mode of carrying out its provisions is absolute and supreme. The interest passing under the will becomes vested and the legislature may not interfere or divest the estate.

It is clear that the act of giving is inextricably tied to the act of receiving. Therefore, if the recipient of a gift becomes possessed of a right to it, it is difficult to divorce that right from the right of the hand that gives it, even though the giver be dead. The basis of the authority of spendthrift trusts is found in the doctrine "cujus est dare, ejus est disponere—he who has the right to give can control the giving", so long as he does not violate existing law. Heyl Estate, 352 Pa. 407, is one of the latest of the long line of voluminous authorities applying the doctrine. There the court states:

"We repeat, spendthrift trusts are allowed not because the law concerns itself for the donee; he may conserve or dissipate as he pleases; the law's only concern is to give effect to the will of the donor as he has expressed it."

The cases uniformly state the application of the doctrine means that testator is possessed of a right to have the terms of his will fulfilled. This doctrine was first applied, not in Holdship v. Patterson, supra, but in Fisher v. Taylor, 2 Rawle 33, involving a testamentary trust.

The historical abhorrence to legislative tinkering with established rights, particularly wills, is illustrated in Brown et al. v. Hummel et al., 6 Pa. 86 (1847),

where the legislature attempted to supersede the trustees appointed by a will. The court said (p. 94) :

"Where this power was or is derived, I am at a loss to perceive. If the legislature, by ex parte enactment, can alter the will of a private individual, whose will shall escape? . . . If the legislature can alter one man's will, by license of the Constitution, they can alter the will of every man. The contemplation of such a state of organic law of society, is calculated to bring the minds of men to a pause. The most solemn act of a man's life, which is consummated by his death, is his last will and testament. By that act he makes a law for the disposition of his own property, acquired by his own industry, which, if it does not contradict the law of the country, has heretofore been considered inviolate."

This case was cited in Craig Estate, 356 Pa. 564, 567 (1947). To permit it to be invaded would destroy the very foundation of the law of property. In Canovaro et al. v. Brothers, etc., 326 Pa. 76, 94, the court said: "The legislature has no power to override a testamentary disposition of property which does not violate any rule of law at the time it takes effect." In Greenough v. Greenough, 11 Pa. 489, testatrix executed her will by mark in 1840, 10 days before her death. It was invalid under the prevailing Act of 1833. In 1848, an act was passed amending the Act of 1833 so that the will would have been valid if covered by its terms. It also provided:

"Every last will and testament heretofore made, or hereafter to be made, excepting such as may have been finally adjudicated prior to the passage of this act, to which the testator's name is subscribed, by his direction and authority, or to which the testator hath made his mark or cross, shall be deemed and taken to be valid."

Held, the Act of 1848 is exclusively prospective and is destitute of retroactive force because it was an act of judicial power beyond that of the legislature, and contravenes article I, sec. 9, of the Constitution of Pennsylvania, that no person shall be deprived of life, liberty or property except by the judgment of his peers or the law of the land. The court declared that the legislature could no more affect the operation of the validity of this will by subsequent legislation than could the court.

In Ervine's Appeal, 16 Pa. 256, testator provided his real estate should not be sold until the death of his son, Daniel, who was given the income of it for life. Daniel procured the legislature to pass an act authorizing the orphans' court to appoint a trustee upon his application to make sale of the real estate and to invest the proceeds. Held, the objections of the other children were sustained. The legislature had no constitutional authority to authorize the sale within the time during which the sale was forbidden by testator. In Wilcox v. Penn Mutual Life Insurance Co., 357 Pa. 581, 1947, wherein the Community Property Act was declared unconstitutional, Justice Horace Stern quoted from Justice Sharswood in Palairet's Appeal, 67 Pa. 479:

" 'If . . . an Act of Assembly . . . operates retroactively to take what is, by existing law, the property of one man, and, without his consent, transfer it to another, with or without compensation, it is in violation of that clause in the Bill of Rights, Const., Art. IX, Sec. 9, which declares that no man "can be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land" . . . By the "law of the land" is meant, not the arbitrary edict of any body of men—not an Act of Assembly, though it may have all the outward form of a law . . . but due process of law . . . If this be not so, every restriction

upon legislative authority would be a vain formula of words, without life or force . . . It has become, then a fundamental axiom of constitutional law . . . that the legislative power cannot either directly or indirectly, without the consent of the owner, take private property for merely private use, with or withont compensation.' "

What has been stated hereinbefore in the discussion of retrospective application of the act respecting the opportunity such construction would give to defraud creditors of life tenants of existing spendthrift trusts, has added emphasis in this aspect of the case because fixed rights of property under contract are involved, in addition to the rights of the conveyor or of his substitutionary beneficiaries.

From these authorities, we conclude that the power to make a will is a privilege resting within the control of the legislature which can change or abolish it at any time, but once that privilege is exercised and effectuated by death, the privilege blossoms into a right in testator to have his dispositions carried out free and clear of all subsequent legislative interference. Subsequent legislative interference amounts to deprivation of property other than by the "law of the land", article I, sec. 9, of the Constitution of Pennsylvania.

Due process or "the law of the land" is found in the exercise of the police power, the right of eminent domain, and of proration of inheritance taxes. In the taking of property under eminent domain, compensation must be made. Under the police power compensation is not required, the taking being justified on the ground of public necessity. One instance is the health of the community: California Reduction Co. v. Sanitary Reduction Co., 199 U. S. 306. Another is the invasion of spendthrift trusts for the support of the life tenant's wife and/or child: Everhart v. Everhart, 87 Pa. Superior Ct. 184. Subsequent legislation prorating

inheritance taxes is valid: Jeffery's Estate, 333 Pa. 15 (1939) ; Harvey Estate, 350 Pa. 53. No such purpose is involved in the instant case.

This decision in no way involves the interpretation of the Act of 1943, authorizing the waiver or disclaiming of powers of appointment, nor does it affect such aspects of the Act of 1945. It would appear that the Act of 1943 is but an expression of the common-law principle that the donee of a general testamentary power may release or extinguish it: Lyon et al. v. Alexander, 304 Pa. 288; Jackson Trust, 351 Pa. 89. If a person can legally release or disclaim a general power, a fortiori he can release or disclaim a special power. Such powers are releasable either in whole or in part, and whether associated with a spendthrift trust or not. Powers of appointment are personal rights: Lyon v. Alexander, supra; whereas we are dealing here with property rights. We know of no authority whereby the dead hand of testator can control powers of appointment in the same complete way as it can control the operation of spendthrift trusts.

The exceptions are dismissed and the adjudication confirmed absolutely.

Judge Ladner concurs in the conclusion of this opinion. Judge Hunter dissents on the retroactive feature of the statute. Judge Klein dissents.

### Concurring opinion

HUNTER, J., October 27, 1948.—In my opinion the Act of June 1, 1945, P. L. 1337, 68 PS §581 et seq., is retroactive, and it is necessary to pass on its constitutionality as applied to spendthrift trusts created before its passage. This act and the prior act of May 28, 1943, P. L. 797, had as their purpose the securing to residents of Pennsylvania certain advantages afforded by the Federal tax laws: See Commission's Report to the Estates Act of 1947, P. L. 100, sec. 3, 20 PS §301.3,

in which these acts are rewritten and reënacted. Obviously these advantages should be confirmed as to existing powers and interests, if such was the clear and manifest intention of the legislature, acting within its constitutional powers.

The Act of 1945, sec. 4, provides that it "shall apply to releases and disclaimers heretofore and hereafter delivered". How could there be a release "heretofore" if there was no power or interest then existing upon which it could operate? It means more than a validation of past releases, because in the words "heretofore" and "hereafter" are included every possible release. There can be no other classification.

Compare the Estates Act of 1947, which in section 21 declares the act to be prospective "except as set forth in section 3 hereof". Section 3 is the release and disclaimer section.

Tax saving under the Federal Revenue Act will be principally in the release of powers of appointment. Releases of powers in great number have been filed in this court. In deciding the present controversy, which involves an interest in property only, we should keep in mind powers as well, because both are the joint subject matter of the Pennsylvania Acts. I express emphatically my approval of Judge Bolger's conclusion that the right of a donee to release or extinguish a power existed at common law in Pennsylvania. The Acts of 1943 and 1945 are confirmatory of it.

In my opinion the Acts of 1943 and 1945 were intended to be retroactive. Further, I believe the Act of 1945 is unconstitutional as to spendthrift interests in property created before its passage, for the reasons given in the majority opinion.

### Dissenting opinion

KLEIN, J., October 27, 1948.—I agree with Judge Hunter that the Act of June 1, 1945, P. L. 1337, 68

PS §581 et seq., is retroactive and I accordingly join in his concurring opinion to this extent. I am not, however, in agreement with the conclusion that the act is unconstitutional as to spendthrift interests created prior to the passage of the act.

There is nothing sacrosanct about a spendthrift trust. Testator has no interest in the property after his death, which is subject to constitutional protection. Whatever rights he had passed under his will to the remainderman, who is a party to these proceedings.

In Pennsylvania the income of a spendthrift trust can be attached by the beneficiary's wife for support: Moorehead's Estate, 289 Pa. 542 (1927). And in New York a statute permitting creditors of a beneficiary of a spendthrift trust to attach his interest to the extent of 10 percent of his income was held to be constitutional: Brearley School v. Ward, 201 N. Y. 358 (1911).

In discussing this case Griswold, in his scholarly book "Spendthrift Trusts" (2nd ed.) said at page 483:

"There seems to be little ground upon which the correctness of the decision in Brearley School v. Ward can be doubted. A statute restraining the alienation of the interest of the beneficiary of a trust is closely analogous to an exemption law, and it has been decided repeatedly that there is no vested right in statutory privileges and exemptions. One of the points which has been urged against the constitutionality of a statute affecting the alienation of prior created spendthrift trusts is that the obligation of some sort of a contract between the settlor and the state or the trustee or someone else may be impaired. This argument, of course, will not stand analysis· There is no contract; it certainly cannot be said that the enactment of legislation by a state through its legislature constitutes an offer for a contract which is accepted by the creation of a trust."

And, further, at page 487, in discussing another New York statute which authorized the voluntary alienation by the beneficiary of his interest in a spendthrift trust, Griswold said:

"Why such a statute should be unconstitutional seems impossible to understand. Certainly the beneficiary is injured in no way; nor does he object. The trustee is not deprived of any interest by the assignment of the beneficiary. And the settlor cannot be invalidly deprived of property of which he is no longer owner, especially in the usual case where he is dead when the issue arises."

The statute under consideration in the present case does not attempt to enable a beneficiary to alienate his interest to a stranger or to a creditor. It merely confers a right upon the beneficiary to give up prospective income in favor of a remainderman. Each time a trustee wishes to pay accrued income, the beneficiary, even without the benefit of a statute, can effectively refuse to accept the payment. He cannot be compelled to accept the income. The statute merely enables the beneficiary to refuse income once and for all time, without the necessity of repeating such refusal every time income is payable to him.

In my opinion, the majority are concerned too much with the so-called rights of dead testator, and unmindful of the rights of his living beneficiaries. With the advent of Federal statutes levying heavy estate and income taxes, a new burden has been placed upon beneficiaries of trust estates which, in many cases, was not contemplated by testator when he made his will, nor by the beneficiary when he originally accepted the benefits thereunder.

The present statute is primarily an effort on the part of the legislature of our State to enable our citizens to take advantage of provisions in the Federal tax laws

which would inure to their benefit. I know of no valid reason why our legislature cannot give our citizens this privilege.

I would therefore sustain the exceptions.