## In re Barbara Haven, etc.

*Edward G. Petrillo*, for petitioner.

LAUB, J., Sixth Judicial District (specially presiding), August 24, 1953. — Petitioner has invoked the provisions of the Act of March 24, 1927, P. L. 64, 48 PS §19, which provides that in special cases a judge of the orphans' court may authorize the issuance of a

marriage license where one or both of the parties are under 16 years of age. The child in this case is a female of the age of 14 years and eight months and desires to marry the son of her father's second wife, a young man 22 years of age. Her father has given his consent and now asks us to do likewise.

The testimony which we took at the hearing discloses that this attractive well-developed girl is physically suited for marriage. She has, however, achieved only the eighth grade in school and, although apparently intelligent, her marks are not of the best. She testified that she has been in love with her stepbrother for two years; has planned marriage almost from the inception of her acquaintance with him, and believes that her love for him is genuine and permanent. He is her first "steady" beau although she did attend school dances with other boys when she was 12 years old.

The young man in the case, Robert Bihler, is a typical, fine American youth. He is industrious and ambitious. There is no observable reason why he should not be married and it is evident that he is suited to become the head of a family.

The social aspects of marriage have become so impressed upon us that law-making bodies everywhere have seen fit to impose safeguards against ill-advised unions. Thus, waiting periods, medical examinations, age restrictions, marriages within certain degrees of consanguinity and affinity, and many other controls have been universally imposed by State legislatures in order to preserve and maintain the utmost purity and integrity of the marriage state. As pointed out in Fulcomer v. Pennsylvania Railroad Company, 141 Pa. Superior Ct. 264, 269, while marriage is a civil contract, the rights under it are under the control of the law-making power. The Supreme Court in Moorehead's Estate, 289 Pa. 542, 552, said:

"The marriage contract once entered upon, becomes a relation rather than a contract and invests each party with a status towards the other and society at large, involving duties and responsibilities which are no longer matter for private regulation, but concern to the Commonwealth. And in this aspect marriage is a social institution, publici juris, being the foundation of the family and the origin of domestic relations of the utmost importance to civilization and social progress; hence the State is deeply concerned in its maintenance in purity and integrity."

At common law a boy under 14 or a girl under 12 could not be married: Blackstone, book 1, chap. 15 (2). But our legislature enacted the current law, apparently concluding that one in the sunlight of youth, standing on the threshold of life, should not walk precipitously into the marriage chamber, but first should look with calm deliberation whether the step is both desirable and safe. In this concept there has been ample support in aphorism and precept.[1] Certainly it is based upon common experience and logic.

The statute in question is, therefore, no pragmatic invasion of the rights of man. It fulfills a two-fold function in protecting marriage as an estate and in placing a restraining hand upon the shoulder of impetuous youth. Our duty directs our attention to the interest of society in marriage, but it also commands us to consider the best interests of the minor as well.

The prime reason advanced in behalf of the present petition is the young lady's protestation of affection for the boy. Love has many emotional counterfeits,

---

[1] "Hasty marriage seldom proveth well": Shakespeare, Henry VI; "Married in haste, we may repent at leisure": William Congreve, The Old Batchelor; "Young ladies!—beware of hasty connections": John Godfrey Saxe, Othello, the Moor; "Who wooed in haste and means to repent at leisure": Shakespeare, The Taming of the Shrew.

each as likely as the other, but time and mature appreciation are the only devices known which detect the real from the spurious. The emotional mechanism of youth, like a sensitive weathercock, points with equal fidelity to the temporary and illusive as to the constant and substantial.

All of this was within the knowledge and contemplation of the legislature when it enacted the present law. When it conferred jurisdiction upon us to set aside the general rule in favor of special cases it could not have meant that our discretion was to be exercised in commonplace situations such as obtains here.

In only a minority of cases do applicants seek marriage licenses without believing sincerely that they are in love and without a compelling desire to unite. It is only in a very small minority of cases that either party is physically unfit for marriage. Therefore, that which calls for action by us must truly be within the legislative concept of something "special", not something based upon the usual, ordinary or the mere urgent desire of the parties.

The proof offered here merely places these young people within the general category. Both are physically fit; both are fine, young citizens. But, in holding the marriage age to 16, the legislature must have realized that there is more to marriage than physical and mental development. It requires mature understanding and judgment; mature emotional stability. Above all, there must be a deep and abiding concept of marriage as more spiritual than physical, more an estate than a condition. In its wisdom the law-making body felt that an appreciation of these elements must be absent in a young girl of the age of the present applicant. It certainly felt that in fulfilling its function as protector of children, the law should not, in the absence of the most compelling circumstances, consent to the marriage of one so young.

We are constrained, therefore, to conclude that, no special circumstances having been shown, we are without jurisdiction to make the order prayed for.

And now, to wit, August 24, 1953, the rule entered August 6, 1953, to show cause why a marriage license should not be issued to Barbara Haven, is discharged.